## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **KEVIN QUINN,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | CIVIL ACTION NO. H-11-3629 |
| **CAROLYN W. COLVIN,** | § | |
| Acting Commissioner of Social | § | |
| Security Administration[1] | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of a denial of Social Security benefits, Plaintiff Kevin Quinn ("Quinn") filed a Motion for Summary Judgment. (Dkt. 15)  Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration, filed her own Motion for Summary Judgment.  (Dkt. 16).  The parties have consented to the jurisdiction of this Court under 28 U.S.C. § 636(c).  Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court **DENIES** Plaintiff's motion and **GRANTS** summary judgment for the Commissioner.

---

[1] Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is the Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. *See* FED. R. CIV. P. 25(D).

## BACKGROUND

Quinn is a 43-year old man who suffers from back pain, shoulder pain, and depression. Quinn has a high school education. From 1989 through 2007, Quinn worked as a welder. Prior to that, Quinn worked as a fork lift operator and a warehouse worker. Quinn alleges that, due to a workplace accident, he became unable to work on September 11, 2007. On April 10, 2008, Quinn filed an application for social security disability benefits.

### *Medical History*

Quinn was injured on September 11, 2007, when a heavy metal plate fell onto the back of his knees. (Tr. 368). Quinn was taken by ambulance to the Emergency Room at Methodist Willowbrook Hospital. (Tr. 368). At the hospital, Quinn complained of tingling but did not report any pain, and only mild swelling was observed. (*Id.*, Tr. 370). During his exam, Quinn's gait was described as "normal." (*Id.*). Quinn was "oriented X 3" and his speech was "spontaneous, well paced, [and] logical." (Tr. 372). An x-ray did not show any fractures. (Tr. 378). Quinn was given crutches and pain medication, and discharged. (Tr. 377).

The next day, Quinn saw Dr. Plino Caldera at KSF Orthopedic Center. (Tr. 253). Quinn arrived using crutches and complained of tingling in his left leg and foot. (*Id.*). Quinn told Dr. Caldera he was in good health, except for his injury, and that he did not have a history of depression or anxiety. (Tr. 254). Dr. Caldera noted that Quinn's knees were tender but that they were not swollen or bruised, and that Quinn's skin was not broken. (*Id.*). An x-ray did not reveal any broken bones or fractures. (*Id.*). Dr. Caldera

2

prescribed Vicodin and Motrin as pain medication and told Quinn to use ambulatory aids as needed and to alternate heat and ice packs. (*Id.*). On October 3, 2007, Quinn saw Dr. Caldera for a follow-up visit. Quinn reported that his knee pain had improved but was still present, especially in his left knee. (Tr. 247). Quinn's exam revealed a full range of motion in both knees. (Tr. 248). Dr. Caldera also described him as "alert and oriented" during the exam. (*Id.*).

Quinn underwent an MRI on October 18, 2007. (Tr. 308). On October 31, 2007, Quinn saw Dr. Caldera again. Quinn reported to Dr. Caldera that he was "doing much better" and "only complain[ed] of some soreness at the posterior aspect of the left knee." (Tr. 244). Dr. Caldera noted that there was no swelling, redness or warmth on Quinn's knees and that his knees did not lock or "giv[e] way." (*Id.*). Quinn's gait at that visit was described as "normal heel-toe pattern bilaterally." (Tr. 245). Quinn's motor strength was rated at 5/5 for his quadriceps, hamstrings, ankles dorsiflexion and ankle plantar flexion. (Tr. 246). At that time, Quinn had been to one physical therapy session and had nine other sessions scheduled. (Tr. 244).

Approximately a week later, on November 6, 2007, Quinn was seen by Dr. Kenneth J.H. Lee of the Spine Care Center. (Tr. 257). During his exam, Quinn denied having a history of depression. (Tr. 260). Quinn told Dr. Lee that he had lumbar back pain since his workplace accident in September 2007. (Tr. 257). Quinn also told Dr. Lee that medication did not help with the back pain. (*Id.*). Quinn rated his back pain as being a 4 out of 5, and reported he felt numbness and tingling in his legs. (Tr. 257). Quinn also reported a "jolting pain especially when he walks." (Tr. 257). Dr. Lee's notes describe

3

Quinn as being "in no acute distress," but he noted that Quinn walked with "an antalgic gait" and had difficulty performing the single left heel rise on the left side. (Tr. 257). According to Dr. Lee, imaging showed a sacrilization of Quinn's L5 vertebrae and that he had "age appropriate spondylosis, which has been minimal." (Tr. 258). Dr. Lee diagnosed Quinn with "weakness and left lower extremity radiculopathy secondary to a left paracentral disc herniation at L5-S1" and recommended that Quinn undergo "an L5-S1 decompression and discectomy." (Tr. 258). Dr. Lee also recommended an epidural steroid injection. Quinn refused injections or surgical interventions due to a family member's problems after spine surgery. Dr. Lee accordingly stated, "I do not have much more to offer this gentleman. I will release him back to work full duty but still under medical care." (Tr. 259).

Quinn next went to Dr. Andrew Kretschmer, who referred him to Dr. Andrew McKay for pain management. (Tr. 338).[2] Quinn saw Dr. McKay on January 15, 2008. (*Id.*). Dr. McKay reviewed the MRI from October, and described it as showing "at the L5-S1 level a 5mm, left posterior lateral disc herniation with spondylosis with mass effect on the left S1 nerve root and right S1 nerve root. Facet arthrosis was seen with bilateral foraminal narrowing. At the L4-5 level there was a 3 mm disc herniation with spondylosis that may abut the L5 nerve root." (Tr. 338). Quinn again stated his reluctance to undergo spinal surgery, so Dr. McKay recommended an epidural steroid injection. (Tr. 339).

---

[2] Records from Quinn's visits with Dr. Kretschmer appear in the record as Exhibit 10F. They are, however, handwritten and illegible.

On January 31, 2008, Quinn received an epidural steroid injection in his lower back. (Tr. 333). Three weeks after the injection, Quinn told Dr. McKay that the injection resulted in a 50% decrease of his pain and an increase in his ability to function. (Tr. 327). On March 17, 2008, however, Quinn met with Dr. Samir Sobhy Ebeade as part of his workers compensation claim process. Quinn told Dr. Ebeade that he was still in significant pain. (Tr. 413). Quinn told Dr. Ebeade that standing for more than 20 minutes, walking more than a few blocks, or bending over all increased the pain, and that "nothing helps including medications." (*Id.*). Quinn also complained to Dr. Ebeade of "aching pain in both shoulders." (*Id.*). Dr. Ebeade described Quinn as walking without a limp and without walking aids, but noted "he walks with a dramatic slow pace and slight flexion posture." (Tr. 413). Dr. Ebeade performed a physical exam and assessed Quinn's range of motion. Dr. Ebeade's report reviewed and briefly summarized Quinn's medical records, including the October 2007 MRI and records from Dr. Caldera, Jennifer Riggens, Quinn's physical therapist, Dr. Lee and Dr. McKay. (Tr. 416-417). Dr. Ebeade opined that Quinn had achieved his maximum medical improvement, and he rated Quinn as having a 3 percent impairment in his shoulders, a 0 percent impairment in his knees, and a 0 percent impairment in his spine. (Tr. 419). Dr. Ebeade assessed Quinn's total impairment at 3 percent. (*Id.*) Dr. Ebeade found that Quinn was able to return to work. (*Id.*). Ten days after seeing Dr. Ebeade, Quinn received a second series of epidural steroid injections in his lower back. (Tr. 304).

On April 10, 2008, Quinn filed for social security benefits, alleging that he was unable to work because of his back injury and the resulting pain. (Tr. 176). On May 23,

2008, Quinn was evaluated for a "Functional Capacity Evaluation" at The Spine and Rehabilitation Center by Dr. Michael Corey Thompson, a chiropractor. (Tr. 406). Dr. Thompson noted that Quinn was "cooperative throughout the evaluation." (*Id.*). Quinn told Dr. Thompson that he was still in pain from his back injury, and that the steroid injections and pain medication had not helped. In addition, Quinn stated that he now had a constant headache and that "therapy seemed to increase his symptoms." Quinn reported decreased strength in his legs and a numbing and cold sensation in his legs and feet. (*Id.*). Dr. Thompson recorded that Quinn had difficulty sitting and standing, a slow and guarded gait, and "significant" difficulty crawling. (Tr. 407). He also recorded that Quinn had "bilateral shoulder pain," significant difficulty with pushing and pulling, and a limited ability to reach and squat. (*Id.*).

On May 27, 2008, Quinn again saw Dr. McKay for a follow-up after his second round of steroid injections. (Tr. 404). Quinn reported "suboptimal" pain relief from the injections, and that he needed pain medication. (*Id.*). Quinn also reported neck pain and migraines "which [had] recently begun." (*Id.*). Dr. McKay described Quinn as being in "mild distress" and recommended Quinn see an orthopedic spine surgeon and begin physical therapy. (Tr. 405).

As part of the disability benefits application process, Quinn appeared for a consultative physical examination with Dr. Hanna J. Abu-Nassar on June 10, 2008. (Tr. 267). Dr. Abu-Nassar described Quinn as a "well developed, well nourished male in no apparent distress," and noted he was "mentally clear and cooperative." (Tr. 268). Although Quinn's back was "exquisite[ly] tender in the mid back as well as in his lower

6

back," Dr. Abu-Nassar described Quinn's gait as "normal" although "slow," and she stated that he was able to get on and off the exam table "normally." (Tr. 269). Further, she noted that Quinn moved around the room "normally" and that there was no evidence of any muscle atrophy. (*Id.*).

On June 24, 2008, Dr. Yvonne Post completed Quinn's Physical Residual Functional Capacity Assessment, opining that he could: (1) occasionally lift 50 pounds and frequently lift 25 pounds; (2) stand and/or walk for a total of about 6 hours in an 8-hour workday; (3) sit with normal breaks for a total of about 6 hours in an 8-hour workday; (4) push and/or pull without limitations. (Tr. 277). The only postural limitation she imposed was occasional stooping. (Tr. 278). Dr. Post's analysis reviewed Quinn's medical history and injury, particularly noting the November 6, 2007 exam by Dr. Lee and the consultative physical exam by Dr. Abu-Nassar. Reviewing the imaging of Quinn's spine, she concluded "This [claimant's] ability to sustain a normal work week is not wholly compromised. Limitations caused by allegations are not supported by medical evidence." (Tr. 283).

On August 4, 2008, Quinn saw Dr. Glenn Bricken, a clinical psychologist, to assess whether he was a "psychologically appropriate candidate for spine surgery or a chronic pain program." (Tr. 291). Dr. Bricken noted Quinn was "alert and oriented" during the exam, and that he did not appear to exhibit any cognitive deficits. (Tr. 292). Quinn reported a loss of energy, fatigue, insomnia, anger, irritability, and difficulties concentrating and focusing. (Tr. 292). He also reported anxiety about his future ability to work. (*Id.*). Dr. Bricken stated that Quinn "presented as a depressed, anxious

7

individual" but that "[w]ith appropriate medical and psychological intervention, Mr. Quinn is likely to make additional recovery, learn to work around his injury and return to gainful employment in a less physically demanding profession." (Tr. 293). Dr. Bricken recommended Quinn begin a trial of antidepressant medication and undergo individual psychotherapy. (Tr. 294). Quinn saw Dr. Bricken again on October 7, 2008 and October 20, 2008. (Tr. 430, 429). Each time, Quinn was noted as alert, oriented to person, place and time, and with intact thought processes and judgment. (*Id.*). He was described as having no attention or concentration deficits. (*Id.*). Dr. Bricken's recommendation after each of these visits was that Quinn "continue cognitive behavioral therapy." (*Id.*).

On November 13, 2008, Dr. Bricken filled out a pre-printed form entitled "Mental Residual Functional Capacity Questionnaire." (Tr. 432). Responding to the questions posed by the form, Dr. Bricken assessed Quinn's GAF as 50. (Tr. 432). Dr. Bricken also checked boxes indicating his opinion that Quinn suffered from a number of serious symptoms, including "[a] pervasive loss of interest in almost all activities," "feelings of guilt and worthlessness," "appetite disturbance," "difficulty thinking or concentrating," and "recurrent severe panic attacks." (Tr. 433). The basis for these opinions was not provided. Dr. Bricken also checked the box stating that Quinn's prognosis was "poor." (Tr. 433). He did not explain the change in his opinion from his August report. With respect to Quinn's "mental abilities and aptitudes," Dr. Bricken checked boxes for almost every area indicating that Quinn was either "unable to meet competitive standards" or had "no useful ability to function." (Tr. 434). The only exception was a box that Dr. Bricken checked to indicate that Quinn was "seriously limited, but not precluded" from

8

"adher[ing] to basic standards of neatness and cleanliness." (Tr. 435). As with his responses elsewhere on the form, Dr. Bricken did not specify the medical findings that led to these conclusions. (*Id.*). Dr. Bricken checked "Yes" when asked "Does your patient had a low IQ or reduced intellectual functioning", stating "chronic pain and medications reduce [patient's] functioning and lower IQ." (*Id.*). Dr. Bricken also checked a line to indicate he believed Quinn would be absent "more than four days per month." (Tr. 435).

Quinn's last examination in the record occurred on February 19, 2009. Quinn appeared for a consultative psychiatric examination with Dr. Martin H. Keeler. (Tr. 444). Dr. Keeler noted that Quinn drove himself to the examination and that Quinn was casually dressed and "did not appear to be an invalid." (Tr. 444). Dr. Keeler stated that Quinn's "attitude was somewhat contentious" but he noted that was "in keeping with the fact that he was protecting against the previous denial of disability [benefits]." (*Id.*). Quinn "was cooperative but became angry when anything that he said was questioned." (*Id.*). Quinn told Dr. Keeler that he had been previously been told to seek treatment for depression, but that he had not done so. (*Id.*). Quinn described his depression as "primarily in terms of feeling angry and disappointed and mistreated." (*Id.*). Quinn reported being able to care for his own needs, cooking, shopping and handling finances. (Tr. 445). Dr. Keeler noted that Quinn "could maintain attention for long periods of time." (*Id.*). Dr. Keeler estimated that Quinn was of "average" intelligence, and noted that Quinn "answered questions accurately and elaborated appropriately. He was logical, coherent and relevant." (Tr. 447, 446). Dr. Keeler assessed Quinn's GAF as 65, and

opined that Quinn was "depressed and discouraged by does not demonstrate sufficient signs of major depression to make that diagnosis at this time." (Tr. 447). Dr. Keeler did note, however, that Quinn "was annoyed throughout the interview." (*Id.*).

Dr. Keeler provided a medical source statement regarding Quinn's ability to perform work activities. (Tr. 449). Dr. Keeler opined that Quinn was "mildly limited" in carrying out simple instructions and in his ability to make judgments on complex work-related decisions. (*Id.*). Dr. Keeler also opined that Quinn was mildly limited in his abilities to interact appropriately with others, stating "He is argumentative at times. The problem is not whether he could be completely appropriate but whether he would care to." (Tr. 450).

### *Procedural History and ALJ Hearing*

On April 10, 2008, Quinn filed an application for social security disability benefits under Title II. Quinn's application was denied initially on June 26, 2008, and again upon reconsideration on October 7, 2008. Quinn requested a hearing before an Administrative Law Judge ("ALJ"), which took place on December 15, 2008 before ALJ Earl W. Crump. Quinn was represented by counsel at the hearing. (Tr. 31). Quinn and his girlfriend testified, as did an impartial vocational expert ("VE"). (Tr. 31).

After the hearing, the ALJ issued a decision finding that Quinn's date last insured was December 31, 2011, but that Quinn had not established he was disabled. (Tr. 15). Accordingly, the ALJ denied Quinn's application for benefits. The ALJ found that Quinn suffered from severe impairments of lower back problems and depression, but that these impairments did not, singularly or in combination, meet or medically equal a listing. (Tr.

10

18, 19). The ALJ found that Quinn had the residual functional capacity ("RFC") to perform a limited range of light work, but that he was precluded from performing detailed work or work requiring sustained concentration, attention, persistence and pace for prolonged periods of time. (Tr. 20). The ALJ found that Quinn's statements regarding his symptoms and their limitations upon his ability to work were not wholly credible to the extent they conflicted with the RFC. (Tr. 21). The ALJ found that Quinn was unable to perform his past relevant work, but that he was a younger individual with a high school education. Considering Quinn's age, education, work experience and RFC, the ALJ found that there were jobs Quinn could perform that existed in significant numbers in the national economy. (Tr. 23). Accordingly, the ALJ found that Quinn "ha[d] not been under a disability" from September 11, 2007 though the date of the decision, February 26, 2010. (Tr. 24).

## APPLICABLE LAW

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing—that is, pointing out to the district court—that there is an absence of evidence to support the

nonmoving party's case." *Celotex*, 477 U.S. at 325.   Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).   "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).   "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) is limited to whether the decision is supported by substantial evidence in the record and whether the proper legal standard was used in evaluating the evidence.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).   Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the decision.   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   The Court must affirm the Commissioner's final decision when substantial evidence supports the Commissioner's decision and the Commissioner followed the relevant legal standards.   *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).   Reversal is appropriate only if no credible evidentiary choices support the Commissioner's decision.   *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir.

12

1988). Indeed, "[t]he court does not reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Carey*, 230 F.3d at 135, *citing Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

The claimant bears the burden of proving his disability by establishing a physical or mental impairment lasting at least 12 months and preventing him from engaging in any substantial gainful activity. 42 U.S.C. §1382c (2004). To determine whether a claimant is capable of engaging in any substantial gainful activity, the Commissioner applies a five-step sequential evaluation process. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. § 416.920(a)(4) (2010). A finding that a claimant is disabled at any point in the five-step process is conclusive and terminates the Commissioner's analysis. *Bowling*, 36 F.3d at 435. Although the burden of production shifts to the Commissioner at step five, the ultimate burden of persuasion remains with the claimant. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

## III. ANALYSIS

Quinn first contends that the ALJ should have made a finding as to whether he was capable of holding a job for a significant period of time. Next, Quinn contends that the ALJ failed to properly account for (1) his shoulder pain, (2) limitations on his ability to walk or stand, and (3) his mental impairments. Quinn also argues that the ALJ should have found his shoulder impairment was "severe."

### A. Statutory Basis for Benefits

Quinn applied for Social Security disability insurance benefits. Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

### B. Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id.*; 42 U.S.C. § 1382c(a)(3)(B).

A disability claim is examined in a five-step sequential analysis to determine whether "(1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the social

security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the claimant is determined to be disabled or not disabled, the determination is conclusive and the inquiry ends. *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform. *Id.* The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545, 416.945. The Commissioner assesses the RFC before proceeding from step three to step four. *Id.* Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut this finding. *Id.*

### C. The ALJ was not required to make a finding regarding Quinn's ability to maintain employment.

The ALJ found that Quinn had the RFC to perform a limited range of light work, but precluded him from performing detailed work or work requiring sustained concentration, attention, persistence and pace for prolonged periods of time. (Tr. 20). Relying on the holding in *Singletary v. Bowen*, Quinn argues that the ALJ should also have made a finding as to whether Quinn was capable of holding a job for a significant

15

period of time. 798 F.2d 818 (5th Cir. 1986). Quinn argues that, due to his allegedly near-constant back pain and episodic numbness, as well his mental impairment, he cannot maintain long periods of concentration and he contends this inability to concentrate should have resulted in a finding that he is unable to maintain employment.

The Fifth Circuit has specifically rejected the contention that an ALJ who finds that a claimant can obtain employment must always make such a second finding. *See, e.g., Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 2003) ("*Singletary* simply interpreted 'disability' under the Act to apply to cases in which a person could work for short periods, but could not hold a job. It did not require . . . separate findings on "obtaining" and "maintaining" a job in every case. . . "). Instead, a finding that the claimant can maintain employment is required only when the claimant's impairment "waxes and wanes" in its manifestation of disabling symptoms. *Frank,* 326 F.3d at 619. In *Frank,* the Fifth Circuit gave an example of when separate finding of a claimant's ability to maintain employment might be required: "For example, if [the Plaintiff] had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination." *Id.* Similarly, a claimant's allegation that he has "good days and bad days" simply does not rise to the level of impairment that would require a second separate finding regarding the claimant's ability to maintain employment. *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).

Additionally, "it is not enough for a claimant to assert, in general, that the impairment waxes and wanes; the claimant must demonstrate that his particular

16

impairment waxes and wanes." *Tigert v. Astrue*, 2012 WL 1889694, 7 (N.D. Tex. May 2, 2012) (Magistrate Judge J. Cureton) (adopted May 24, 2012); *see also Frank*, 326 F.3d at 465 ("It is axiomatic that the pain from any type of ailment will vary in intensity, especially the farther one gets from treatment that alleviates pain."). Instead, any fluctuations of the claimant's symptoms record are to be taken into account during ALJ's formulation of the RFC, which is "an assessment of an individual's ability to do sustained work-related physical and mental activities, meaning eight hours a day for five days a week." SSR 96-8p; *see, e.g., Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003) (separate finding on ability to maintain employment is not required "absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC").

The record does not show that Quinn has not established that he has the type of impairments contemplated by *Frank*. Instead, the substantial evidence in the record demonstrates that Quinn's back pain was largely self-reported and that it improved with treatment and medication. Substantial evidence also supported the ALJ's finding that Quinn's testimony about the level of interference posed by his back pain was not wholly credible to the extent it conflicted with the objective medical evidence in the record. Similarly, Quinn's mental impairment of depression arose out of his back pain and medical providers opined that his depression was expected to improve with medication and treatment. Even though the evidence raised questions about the level to which these

17

symptoms interfered with Quinn's ability to concentrate, the ALJ nonetheless assessed an RFC that accounted for these alleged issues. The ALJ found that Quinn had the RFC to perform a limited range of light work, but precluded him from performing detailed work or work requiring sustained concentration, attention, persistence and pace for prolonged periods of time. (Tr. 20). Thus, the ALJ's RFC properly accounted for the issues Quinn now raises and the ALJ was not required to make a separate finding as to whether Quinn was able to maintain employment over a period of time.

### D. The ALJ's RFC determination is supported by substantial evidence.

Next, Quinn contends that the ALJ's RFC analysis failed to properly account for (1) his shoulder pain, (2) limitations on his ability to walk or stand, and (3) his mental impairments. Quinn also argues that the ALJ should have found his shoulder impairment was "severe."

#### 1. Quinn's Shoulder Pain

The ALJ found that Quinn had the RFC to perform a limited range of light work, limiting him to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; pushing and/or pulling 20 pounds occasionally and 10 pounds frequently; standing and/or walking for 6 hours in an 8-hour day; sitting for 6 hours in an 8-hour workday; and only occasional climbing, balancing, stooping, kneeling, crouching and crawling. (*Id.*) Quinn argues that this RFC fails to adequately account for his shoulder impairment, and he also argues the ALJ erred by not including his shoulder pain among his list of severe impairments.

The evidence does not support Quinn's argument that his shoulder pain is a severe impairment. The relevant standard for determining whether an impairment is "severe" is found in Fifth Circuit's holding in *Stone v. Heckler* that an impairment is not severe "only if it is a slight abnormality [having] such minimal effects on the individual that it would not be expected to interfere with the individual's ability to work." 752 F.2d 1099, 1101 (5th Cir. 1985). Quinn bears the burden of establishing that his impairment is "severe." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). However, Quinn did not list shoulder pain on his initial application for benefits, except to generally state that "back injury has caused pain overall in my entire body," nor did his descriptions of his symptoms include any shoulder pain or impairment. (Tr. 176, 184). Quinn's 8-page Function Report, listing his alleged symptoms and limitations at length, contains only one mention of shoulder pain—he states his ability to reach overhead is "limited" due to shoulder pain. (Tr. 202).

Next, the medical evidence contains little mention of Quinn reporting shoulder pain or limitations. The only two doctors whose notes contain discussion of shoulder pain are Dr. Thompson and Dr. Ebeade, who evaluated Quinn for a workers compensation claim. Dr. Thompson saw Quinn for a "Functional Capacity Evaluation" and noted Quinn complained of bilateral shoulder pain when pushing, pulling and reaching. (Tr. 407). The evaluation was "incomplete" but generally noted that Quinn's functional strength testing was "fair" to "good," despite Quinn's complaints of shoulder pain. (Tr. 408). Similarly, Dr. Ebeade assessed only a 3 percent impairment in Quinn's

shoulders and he opined that Quinn could return to work with this impairment. (Tr. 413). Dr. Ebeade's finding of 3 percent impairment is unexplained.

Finally, at the ALJ hearing, Quinn did not mention any pain in his shoulders until he was specifically prompted by the ALJ. (Tr. 53). When asked, Quinn stated he could not reach over head with either arm because "both of my shoulders were injured also." (Tr. 53). The record, however, does not reveal any independent injury to Quinn's shoulders. Finally, during the hearing, Quinn told the ALJ that he was not taking any pain medication for his back or shoulder pain.

Even if Dr. Ebeade's opinion that Quinn had a 3 percent impairment in his shoulders had been well-explained and supported, Quinn has not provided any authority to show that a 3 percent impairment constitutes a "slight abnormality" that would have more than a "minimal effect" on him and "be expected to interfere with his ability to work." Additionally, Quinn was not taking pain medication for his shoulders or back pain, and the ALJ found that Quinn's testimony about his pain and symptoms was not fully credible to the extent it conflicted with the medical record. Accordingly, the ALJ did not err by failing to include Quinn's alleged shoulder pain among the list of his "severe" impairments. *See, e.g., Joubert v. Astrue*, 287 Fed. App'x 380 (5th Cir. 2008) (substantial evidence supported ALJ's determination that claimant's hypertension, chest pain and back pain were not severe when medical evidence showed few complaints of pain and only limited treatment, and medication controlled symptoms).

Next, Quinn argues that his shoulder pain limits his ability to "push, pull, and reach" and the RFC assessed was in error. In making an RFC assessment, the ALJ must

20

consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence. The ALJ must also consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96–7p; SSR 96–8p.  The ALJ limited Quinn's RFC to less than the full range of light work: i.e., to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; pushing and/or pulling 20 pounds occasionally and 10 pounds frequently. Even Quinn admitted that, without any pain medication, he could lift a gallon of milk and perform some limited household chores.  (Tr. 53).  This is significantly more restricted than the RFC assessed by Dr. Post (Tr. 277), and is in line with Quinn's own estimations of his abilities.  (Tr. 406).  Accordingly, the RFC took Quinn's alleged limitations into account and the medical evidence in the record does not support greater limitations than those imposed by the ALJ.

### 2.  Limitations on Ability to Walk or Stand

Quinn also contends the ALJ failed to account for his limited ability to walk and stand, and he contends the ALJ's RFC is not supported by substantial evidence. The ALJ limited Quinn to standing and/or walking for 6 hours in an 8-hour day, and sitting for 6 hours in an 8-hour workday.  Quinn relies on his 2007 MRI, which he contends shows "posteroiated disc protrusion and sponylosis [sic] with mass affect upon the left ventrolateral thecal sac and left and right nerve root." Quinn also points to Dr. Thompson's notes that he had "significant difficulty" and pain upon standing, and to Dr. Lee's notes that he reported "jolting pain" when walking.

The notes to which Quinn points are largely records of his self-reported symptoms. In contrast, there is substantial evidence in the medical record showing that Quinn retained normal lower extremity strength and that his movements and gait were repeatedly described as "normal." (Tr. 370, 245, 269). Further, the spondylosis of the spine to which Quinn points was described as "minimal" and Dr. Lee, upon whom Quinn relies, released Quinn to return to work in 2007. (Tr. 258). Finally, even Quinn testified he could walk "maybe a couple of blocks." (Tr. 52). Substantial evidence therefore supports this portion of the ALJ's RFC assessment.

### 3. Mental Impairments

Finally, Quinn contends the ALJ erred in finding that he was only "mild[ly]" limited in social functioning. Quinn points to Dr. Bricken's opinion that Quinn was unable to maintain socially appropriate behavior, and to Dr. Keeler's notes that Quinn was "annoyed" and "isolated" and "argumentative."

Dr. Bricken's notes from his examinations of Quinn note that Quinn was "alert and oriented," and that he did not appear to exhibit any cognitive deficits. (Tr. 292). Dr. Bricken further stated that "[w]ith appropriate medical and psychological intervention, Mr. Quinn is likely to make additional recovery, learn to work around his injury and return to gainful employment in a less physically demanding profession." (Tr. 293). These notations contrast sharply with the opinions Dr. Bricken later reported via a pre-printed form entitled "Mental Residual Functional Capacity Questionnaire." (Tr. 432). The ALJ discounted the bulk of Dr. Bricken's opinions on this form as "internally inconsistent and inconsistent with the record as a whole." (Tr. 22). The ALJ noted that

22

Dr. Bricken's opinions of Quinn's limitations were "highly excessive" and contradicted Dr. Bricken's own notes. (*Id.*). This type of treating physician questionnaire has been described by the Fifth Circuit as "typify[ing] 'brief or conclusory' testimony." *Foster v. Astrue*, 410 Fed. App'x. 831, 833 (5th Cir. Feb.10, 2011). The substantial evidence in the record supports the ALJ's decision to discount Dr. Bricken's opinions regarding Quinn's social functioning as being inconsistent and unsupported.

Similarly, Dr. Keeler's notes do not support Quinn's claim that the ALJ should have found greater social limitations. Dr. Keeler, a consulting psychiatric examiner, noted that Quinn's "attitude was somewhat contentious in keeping with the fact that he was protecting against the previous denial of disability [benefits]." (Tr. 444). Dr. Keeler observed that Quinn "was cooperative but became angry when anything that he said was questioned." (*Id.*) Dr. Keeler did note that Quinn "was annoyed throughout the interview," but found that he was only "mildly limited" in his abilities to interact appropriately with others, stating, "The problem is not whether he could be completely appropriate but whether he would care to." (Tr. 450). These statements, and Dr. Keeler's opinions as a whole, are consistent with the ALJ's finding regarding Quinn's mental limitations. Substantial evidence therefore supports the ALJ's findings regarding Quinn's mental limitations.

## CONCLUSION

A review of the record reveals that the ALJ applied the appropriate legal standards in making his determination. A review of the pleadings, the discovery and disclosure materials on file, and any affidavits shows that there is no genuine issue as to any material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(c). Accordingly, Quinn's Motion for Summary Judgment is **DENIED** and the Commissioner's Motion for Summary Judgment is **GRANTED**.

Signed at Houston, Texas on June 6, 2013.

_George C. Hanks_

**GEORGE C. HANKS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

24